IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION

SAMANTHA ALEXANDER,              :        Case No. 5:12-CV-02693

      Plaintiff,                      :

         vs.                         :

MICHAEL ASTRUE[1],               :        **MAGISTRATE'S REPORT AND**
COMMISSIONER OF SOCIAL SECURITY,          **RECOMMENDATION**

      Defendant.                      :


## I. INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to 72.2(b)(2) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES.  Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act (Act) and Supplemental Security Income (SSI) under Title XVI of the Act.  Pending are the Briefs of the parties and Plaintiff's Reply (Docket Nos. 13, 14 & 15).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security.  As Michael Astrue's successor, Ms. Colvin is automatically substituted as a party to this litigation, pursuant to FED. R. CIV. P. 15(d).

## II.  PROCEDURAL BACKGROUND.

On January 8, 2010, Plaintiff filed applications for DIB and SSI, alleging that she became unable to work because of her disabling condition on November 1, 2009 (Docket No. 10, pp. 156-157 & 163-166 of 470).  The applications for DIB and SSI were denied initially and upon reconsideration (Docket No. 10, pp. 121-124; 125-127; 135-137 & 142-144 of 470).  On April 12, 2011, Plaintiff, represented by counsel, and Vocational Expert (VE) Gene Burkhammer, appeared before Administrative Law Judge (ALJ) Hilton R. Miller for hearing (Docket No. 10, p. 42 of 470).  On May 6, 2011, the ALJ rendered an unfavorable decision, finding that Plaintiff was not entitled to a period of disability and DIB (Docket No. 10, pp. 22-36 of 470).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on May 6, 2011 (Docket No. 10, pp. 19-21 of 470).  Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

## III.  FACTUAL BACKGROUND.

At the administrative hearing convened in Akron, Ohio, Plaintiff and the VE testified.  A summary of their testimony follows.

### A.      PLAINTIFF'S TESTIMONY.

Plaintiff, a high school graduate, was 22 years of age and she weighed 120 pounds.  Plaintiff had an active commercial driver's license (CDL) and was able to drive.  She resided with her brother, his spouse and their child (Docket No. 10, pp. 46-47; 48 of 470).

In return for room and board, Plaintiff provided care for her brother's daughter four days weekly from 9:00 A.M. to 5:00 P.M. (Docket No. 10, pp. 55-56 of 470).  Previously, Plaintiff worked through a temporary agency where she was the proverbial jack-of-all trades.  Consigned to

2

Target, Plaintiff unloaded the trucks and stocked the store shelves.  At Rubbermaid®, she stood while assembling bowls and lids which when packaged weighed twenty-five pounds.  At McDonald's, Plaintiff was a crew leader, wherein she performed every task from cooking to stocking the products.  Consigned to Steak 'n Shake, Plaintiff performed duties similar to those performed at McDonald's (Docket No. 10, pp. 51-54 of 470).

While employed full-time at McDonald's, Plaintiff completed the certification requirements for employment as a truck driver.  As a truck driver, Plaintiff worked eleven-hour days, climbing in and out of the trailer, loading stock and putting chains on tires.  In 2009, she earned $6,000 for four months work and was allotted $44 per day for food (Docket No. 10, pp. 51; 70; 71 of 470).

Plaintiff testified that during October 2009 she was diagnosed with multiple sclerosis (MS), a common demyelinating disorder of the central nervous system which caused patches of sclerosis (plaques) in the brain and spinal cord.  Her symptoms of MS include vertigo, painful buttocks, tingling and numbness in her legs, numbness in her back and a dropping face.  Plaintiff first noticed vertigo while she was working.  Having moved too fast, Plaintiff experienced an attack which resulted in vomiting and spinning.  Furthermore, Plaintiff had difficulty feeling that her bladder was full; she had sensation problems from her neck down; she had difficulty walking and her hands were chronically cold.  Plaintiff sought treatment once she started having shooting pain in her head (Docket No. 10, pp. 59-62; 67-68 of 470; STEDMAN'S MEDICAL DICTIONARY 367270 (27th ed. 2000)).

Plaintiff's condition had improved to the extent that she no longer suffered from droopy face. She was prescribed a cane to assist with the difficulties walking; however, at her young age, vanity and/or pride prevailed and she refused to use a cane even though she fell approximately twice

monthly and she had difficulty standing after sitting on the toilet.  Standing and sitting were so painful that Plaintiff was required to "keep moving" to reduce its intensity.  Ironically, constant moving precipitated dizziness (Docket No. 10, pp. 59; 61; 62; 65 of 470).

Plaintiff was undergoing treatment to moderate the symptoms related to MS and depression. Prescribed Copaxone®, a medication thought to modify the immune system that is believed to be responsible for the pathogenesis of MS, and Meclizine, a medication used to treat or prevent nausea, vomiting and dizziness, Plaintiff lacked the financial resources to pay for these medications.  This meant that occasionally she skipped dosages.  With respect to her depression, Plaintiff admitted to the random thoughts of suicide and cutting herself on her wrists, ankles and legs.  She last engaged in the cutting behavior approximately one month prior to the hearing.  Plaintiff was undergoing psychotherapy at Portage Path [Behavior Health], where a psychiatrist employed a drug therapy program to modulate depression and panic attacks.  To that end, Plaintiff was prescribed a combination of Abilify®, a medication used in the treatment of schizophrenia; Trazodone, an antidepressant; and Xanax, a medication used in the treatment of panic disorders (Docket No. 10, pp. 49-50; 62-64; 67 of 470; PHYSICIAN'S DESK REFERENCE, 2006 WL 390161 (2006); www.drugs.com/meclizine; PHYSICIAN'S DESK REFERENCE, 2006 WL 367852 (2006); PHYSICIAN'S DESK REFERENCE, 2006 WL 369195 (2006); PHYSICIAN'S DESK REFERENCE, 2006 WL 384705 (2006)).

Plaintiff did not socialize much but she did watch television and listen to music.  Her ability to engage in most activities was impaired by her difficulty with concentration and attention.  Her typical day included preparing the child's meals, changing her diapers, dressing her and reading to her.  When the child in her care napped, so did Plaintiff (Docket No. 10, pp. 56; 58; 65 of 470).

4

**B.**     **THE VE'S TESTIMONY**.

Having familiarized himself with Plaintiff's vocational background, the VE affirmed that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a universal classification of occupational definitions and how the occupations are performed.    The categorization of Plaintiff's previous employment by the applicable DOT, physical exertional level and specific vocational preparation (SVP) follows:

| JOB & DOT | PHYSICAL EXERTIONAL LEVELS.    Jobs are classified as sedentary, light, medium, heavy and very heavy.  These terms have the same meaning as they have in DOT. | SVP is the amount of lapsed time required by typical worker to learn the techniques, acquire the information and develop the facility needed for average performance in a specific job-worker situation. Www.onetonline.org. |
|---|---|---|
| FAST  FOOD  WORKER  DOT 311.472.010 | LIGHT LEVEL OF EXERTION or work which involves lifting no more than 20 pounds at a time with frequent lifting or carry of objects weighing up to 10 pounds.  It requires a good deal of standing and walking. 20 C. F. R. §§ 404.1567(b), 416.967(b). | 2–anything beyond short demonstration up to and including one month |
| SEMI DRIVER  DOT 904.383-010 | MEDIUM LEVEL OF EXERTION or work which involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. Generally requires standing and walking six out of eight hours, use of the arms and hands necessary to grasp, hold and turn object with frequent bending and stooping. 20 C. F. R. §§ 404.1567(c), 416.967(c) | 4--Over 3 months up to and including 6 months |

(Docket No. 10, pp. 69-70 of 470; www.occupationalinfo.org).

**1**.     **THE FIRST HYPOTHETICAL QUESTION**:

Initially, the ALJ asked the VE to determine if this hypothetical individual could perform any of the characteristics of Plaintiff's past work?

Consider a hypothetical individual of Plaintiff's age, education, work experience and residual functional capacity to lift and/or carry up to twenty pounds occasionally and ten pounds frequently; with the ability to:  (1) stand and/or walk with normal breaks

5

for a total of six hours during an eight-hour workday, (2) sit with normal breaks for a total of about six hours in an eight-hour workday; (3) occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds; (4) handle simple but not complex instructions, (4) supervise others but would be most comfortable working alone in a low stress environment, having brief superficial contact with others in a routine setting without demands for meeting strict time or performance standards; however, the hypothetical individual must avoid all exposure to hazards such as machinery and height.

The VE responded that the hypothetical individual could perform Plaintiff's past work as a fast food worker.  It was likely that during peak hours, there would be inordinate amounts of stress but generally the hypothetical person could perform this job.  In addition, the hypothetical individual could perform three other jobs for which there are a quantity of jobs available within the designated geographic areas:

| JOB | REGION | STATE | NATIONAL |
| --- | --- | --- | --- |
| HOUSEKEEPING CLEANER DOT 323.687-014 | 2,000 | 30,000 | 500,000 |
| MAIL CLERK DOT 209.687-026 | 600 | 5,000 | 160,000 |
| RETAIL TRADE MARKER DOT 209.587-034 | 800 | 8,000 | 180,000 |

(Docket No. 10, pp. 71-73 of 470).

**2.    THE SECOND HYPOTHETICAL QUESTION.**

Does the need to have brief superficial contact with others eliminate a fast-food worker from the possible jobs that this hypothetical individual can perform?

The VE responded that the superficial nature of the work was okay. [The contact] would be brief if the hypothetical person was working the register so that would probably be okay.  However, serving a lot of people in a row may disqualify that job from the pool of possible jobs the hypothetical individual could perform (Docket No. 10, p. 73 of 470).

3.  **THE THIRD HYPOTHETICAL QUESTION.**

If the hypothetical individual were a grill person, taking orders and operating the cash register, could he or she perform the duties of a fast-food worker?

The VE opined that if limited to just grill work, the hypothetical worker could perform the duties of a fast-food worker (Docket No. 10, p. 74 of 470).

4.  **THE FOURTH HYPOTHETICAL QUESTION.**

Considering the conditions in the first hypothetical question, Plaintiff's counsel added the following limitations:

> . . . . because of problems associated with either MS or vertigo, this individual would need a sit/stand option. . . . .the individual would be unable to work around extremes in temperature. . . . or need to move from a very cold environment into a warm environment . . . excluding going from the outside into an office-type environment.

The VE responded that these limitations would eliminate the fast-food worker but not the other jobs.  The need for a sit/stand option would eliminate all light-level positions (Docket No. 10, pp. 75-76 of 470).

5.  **THE FIFTH HYPOTHETICAL QUESTION.**

Considering the conditions in the first hypothetical question, and adding that the hypothetical individual would be absent from work greater than 15% of any given month, the VE suggested that competitive employment would be eliminated (Docket No. 10, pp. 76-77 of 470).

## IV.  MEDICAL EVIDENCE.

Medical evidence is the cornerstone in determining the claimant's eligibility for SSI or DIB. Therefore, each claimant is responsible for providing medical evidence showing that he or she has an impairment and the severity of that impairment.  20 C. F. R. §§ 404.1512(c), 416.912 (Thomson Reuters 2013).  The medical evidence generally comes from sources who have treated or evaluated

the claimant for his or her impairment.  20 C. F. R. §§ 404.1512 (c), 416.912(b) (Thomson Reuters 2013).  The following is a recap of the sources who treated and/or evaluated Plaintiff.

      1.      **AKRON GENERAL MEDICAL CENTER (AGMC).**

On October 31, 2009, Plaintiff presented to the emergency department with a headache, blurred vision and paresthesias.  Several laboratory and diagnostic tests were performed, including a complete blood count and a thyroid-stimulating hormone blood test.  Results from all of these tests were unremarkable.  Plaintiff was admitted for further MS work up and discharged on November 7, 2009 (Docket No. 10, pp. 243-256 of 470).

While hospitalized, Plaintiff underwent diagnostic testing that included an MRI and computed tomography (CT) scan as well as an evaluation for services in the physical therapy department.  The results from 35 images of Plaintiff's brain administered, showed no acute bleed or infarct and the cortical depression in the surface of the brain, ventricles and extra-axial compartments were all within normal limits.  Results from an MRI confirmed the presence of an active demyelinating process and numerous white matter abnormalities consistent with MS.  When the results from the MRI and CT scan were correlated, there was no evidence of recent intracranial hemorrhage, mass lesions or recent infarction in either test.  Plaintiff tried several exercises under the supervision of a physical therapist and she was encouraged to avoid heat and read references from the National MS Society (Docket No. 10, pp. 267-269; 271-272 of 470).

On November 2, 2009, Plaintiff underwent a mental health consultation after acknowledging that she was having suicidal ideations.  The attending physician organized the psychiatric diagnosis into five dimensions:

8

| | |
|---|---|
| The five axis model is designed to provide a comprehensive diagnosis that includes a complete picture of not just acute symptoms but of the entire scope of factors that account for a patient's mental health. | The attending physician's impression of Plaintiff's mental status. |
| I.  Clinical Disorders<br>This represents acute symptoms that need treatment. | Plaintiff has the following impairments:<br>(1) Major depressive disorder (MDD), severe without psychosis;<br>(2) Generalized Anxiety Disorder;<br>(3) Post-traumatic stress syndrome (PTSD) |
| II. Personality Disorders and Intellectual Disabilities<br>Axis II is for assessing personality disorders and intellectual disabilities.  These disorders are usually life-long problems that first arise in childhood, distinct from the clinical disorders of Axis I which are often symptomatic of Axis II. | Deferred |
| III. General Medical Condition<br>Axis III describes physical problems that may be relevant to diagnosing and treating mental disorders. | New diagnosis of MS |
| IV. Psychosocial and environmental Disorders<br>Axis IV reports psychosocial and environmental stressors that may affect the diagnosis, treatment, and prognosis of mental disorders | Deferred |
| V. The Global Assessment of Functioning Scale (GAF)<br>The GAF is a numeric score used by mental health clinicians and physicians to rate subjectively, the social, occupational and psychological functioning of adults. | Deferred |

Plaintiff was strongly encouraged to continue psychotherapy, follow up with neurology, quit smoking and stop driving (Docket No. 10, pp. 257-261 of 470).

Plaintiff did not present to the emergency room again until March 20, 2010.  Diagnosed with benign positional vertigo, Plaintiff's symptoms of nausea and vomiting were resolved with mediation (Docket No. 10, pp. 442-452 of 470).

Plaintiff presented on March 23, 2010 with "generic problems."  Results from the diagnostic tests confirmed an elevated white blood count.  She was diagnosed with and treated for vertigo and an upper respiratory infections (Docket No. 10, pp. 428-441 of 470).

Plaintiff presented to the emergency department on April 2, 2010, complaining of nausea and

vomiting.  Diagnosed with benign vertigo, an anti-nausea medication was dispensed (Docket No. 10, pp. 420-427 of 470).

On April 12, 2010, Plaintiff complained of dizziness and vertigo.  The axial images of her head showed no evidence of acute intercranial hemorrhage, mass-effect, midline shift or abnormal extra-axial fluid collection.  There was no definite abnormal brain parenchymal attenuation and no definite evidence of acute cortical infarct or intracranial mass lesion.  In other words, the CT scan of Plaintiff's head was within normal limits (Docket No. 10, p. 419 of 470).

      **2.**        T<small>HE</small> O<small>AK</small> C<small>LINIC</small>.

Dr. Christopher A. Sheppard, M. D., a board certified physician who specializes in internal medicine, conducted an evaluation on February 24, 2010, and concurred that many of the symptoms such as fatigue, weight loss, back pain and neck pain, were all attributable to MS.  He discussed the use of disease modifying medications and enrollment in a patient assistance program (Docket No. 10, pp. 276-279; 333-336 of 470; www.healthgrades.com/physician/dr-christopher-sheppart-2wvt2.)

On June 9, 2010, Dr. Sheppard confirmed the presence of Lhermitte's phenomenon, a sudden transient electric-like shock extending down the spine triggered by flexing the head forward.  The causes of this phenomenon included MS.  He also noted some cognitive and fatigue issues which he also related to the MS (Docket No. 10, pp. 330-331 of 470; www.medterms.com).

Plaintiff presented on January 7, 2011, complaining that she was experiencing numbness, tingling, cramping and spasms in the extremities.  At the same time, her parents were separated, the dosage of Paxil did not assist with controlling her symptoms of depression; her vision had changed, and she was discharged by her primary care physician.  Seeing no neurological abnormalities signifying that her MS was out of control, Dr. Sheppard attributed the physical symptoms to elevated stress.  He prescribed a drug regimen which included Baclofen, a muscle relaxer used to treat muscle

10

symptoms caused by MS (Docket No. 10, pp. 392-393 of 470; www.drugs.com).

On July 3, 2012, Dr. Sheppard completed a form captioned MULTIPLE SCLEROSIS RESIDUAL FUNCTIONAL CAPACITY QUESTIONNAIRE[2].  It was his opinion that Plaintiff's symptoms would last at least twelve months but her prognosis was fair.  He opined that Plaintiff's MS may affect what she could do in the work setting accordingly:

1. She had balance problems, poor coordination, weakness, unstable walking, numbness, pain, depression, blurred vision and pain.
2. Emotional factors would contribute to the onset of Plaintiff's symptoms and functional limitations.
3. She was capable of performing low stress jobs.
4. She could walk two city blocks; sit more than two hours; stand thirty minutes at one time; sit about four hours in an eight-hour workday; stand/walk less than two hours in an eight-hour workday; take unscheduled breaks up to two times daily and rest for ten to twenty minutes each time before returning to work; occasionally lift and carry less than ten pounds; occasionally lift and carry ten pounds; rarely lift and carry twenty pounds and never lift and carry fifty pounds; rarely twist, crouch and climb stairs; never stoop (bend) or climb ladders; and use her hands, fingers and arms 50% of the time during an eight-hour working day on a competitive job.
5. She should avoid all exposure to extreme cold, extreme heat, humidity and hazards and avoid concentrated exposure to wetness.
6. She would be absent from work as a result of the impairment or treatment two days per month.

(Docket No. 10, pp. 465-470 of 470).

**3.    DR. SHERRY L. GERGIS, M.D.**

A resident in the AGMC's Department of Psychiatry and Behavioral Sciences, Dr. Gergis diagnosed Plaintiff with an adjustment disorder and depressed mood, ruling out MDD.  She conducted a series of psychotherapy sessions on November 16, 2009, November 23, 2009, December 7, 2009, December 14, 2009, December 21, 2009, February 22, 2010 and March 12, 2010, during which she subjectively determined that Plaintiff's social, occupational and psychological

---

[2]

The ALJ rendered his decision on May 6, 2011.  This form was submitted to the Appeals Council on August 30, 2012.

functioning fell within the range of 60-70, a score that denotes the presence of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Although Plaintiff continued to experience racing thoughts and had difficulty sleeping, her mood was consistent and somewhat improved provided she complied with the drug therapy. Dr. Gergis considered supplementing Plaintiff's drug regimen with Wellbutrin, a medication used to treat MDD; however, Dr. Gergis found value in maintaining the current regime, specifically since she obtained positive feedback from Plaintiff provided she took the antidepressant supplemented with psychotherapy (Docket No. 10, pp. 281-291 of 470; www.healthgrades.com/physician/dr-sherry-gergis-gfcqr).

4.    **PHYSICAL RESIDUAL FUNCTIONAL** Capacity.

Dr. W. Jerry McCloud, M. D., completed the PHYSICAL RESIDUAL FUNCTIONAL CAPACITY assessment on March 17, 2010. He opined that Plaintiff should avoid all hazards, machinery and heights; otherwise, Plaintiff had no communicative or manipulative limitations. In fact, she could:

1.    Occasionally lift and/or carry twenty pounds and balance:
2.    Frequently lift and/or carry ten pounds;
3.    Stand and/or walk for a total of about six hours in an eight-hour workday;
4.    Sit about six hours in an eight-hour workday;
5.    Push and pull on an unlimited basis; and
6.    Never climb using a ladder/rope/scaffold.

(Docket No. 10, pp. 293- 299 of 470).

5.    **PORTAGE PATH BEHAVIORAL HEALTH.**

A clinical intake evaluation was completed on April 29, 2010, during which Plaintiff explained that she had MS accompanied by severe pain, a loss of appetite, inability to sleep and racing thoughts. She also reported that she became irritated easily. At the conclusion of the

12

assessment, Plaintiff was diagnosed with MDD, recurrent and moderate; cannabis abuse; and PTSD. The numeric score used by the mental health clinician to rate Plaintiff's social occupational and psychological functioning denoted the presence of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work) (Docket No. 10, pp. 357-368; 377 of 470).

During a face-to-face visit on May 12, 2010, Plaintiff's affect was relatively flat and her mood was depressed.  She was struggling with her loss of health and its affect on her ability to be independent (Docket No. 10, pp. 375-376 of 470).

On July 29, 2010, Plaintiff participated in a 30-minute counseling session during which an attempt was made to establish a rapport with the counselor.  She was encouraged to attend a MS support group (Docket No. 10, p. 374 of 470).

Plaintiff underwent a psychiatric evaluation on September 22, 2010, during which she admitted that, *inter alia*, she was gay, she used marijuana daily, she was physically abused by her father and she heard voices.  Diagnosed with a bipolar disorder, NOS; alcohol abuse; PTSD; and cannabis abuse, the evaluator attributed a numerical GAF score of 45, an indicator of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work).  Medications used to prevent and control seizures and mood swings as well as treat anxiety and allergic skin reactions were prescribed along with an admonishment to refrain from use of alcohol, use of drugs, driving and engaging in dangerous activities (Docket No. 10, pp. 369-371; 412 of 470).

On October 11, 2010, Plaintiff requested that her medication regimen be changed due to

constant nausea.  She continued to be very somatic and anxious.  A prescription for Abilify® was added to the regimen of drugs (Docket No. 10, pp. 409-411 of 470).

On November 18, 2010, the counselor presented coping skills and methods to manage stressors (Docket No. 10, pp. 406-407 of 470).

On December 7, 2010, Paxil, an antidepressant and anti-anxiety drug, was added to the regimen.  On January 11, 2011, Plaintiff reported that she quit taking Paxil for the reason that it made her ill.  She continued to take Abilify.  Plaintiff felt very anxious and angry due to her family conflict (Docket No. 10, pp. 402-403; 404 of 470).

Plaintiff's mood was better and the symptoms of her MS had improved on January 18, 2011.  Apparently, the MS support group had been helpful in relieving stress and the medication was having a positive affect on the symptoms (Docket No. 10, pp. 399-401 of 470).

During a counseling session on January 28, 2011, coping strategies were discussed as an alternative to cutting herself (Docket No. 10, p. 396-397 of 470).

On April 20, 2010, Plaintiff reported to the Portage Path Psychiatric Emergency Services.  Apparently, she was having difficulty coping with her circumstances, including but not limited to her parent's divorce, her lack of finances and her lack of a job.  She reported that she was self-medicating for relief from the symptoms of MS.  Put on a 24-hour treatment plan, Haldol, an anti-psychotic drug was administered.  Plaintiff was discharged on April 21, 2010 without a supply of medication and instructed to seek outpatient treatment (Docket No. 10, pp. 459-463 of 470; www.drugs.com).

6.  **PSYCHOLOGICAL EXAMINATION**.

Dr. Joshua Magleby, Ph. D., a clinical neuropsychologist, conducted a mental status examination on April 21, 2010.  It was his opinion that Plaintiff had chronic vertigo that was due

14

to MS and that it made her nauseous and impaired her movement.  Plaintiff's intelligence was average and the most serious of her mental symptoms at the time were a racing mind, memory loss and fatigue.

He, too, diagnosed Plaintiff with PTSD and chronic depressive disorder.  Dr. Magleby opined that Plaintiff's GAF was 60, a score denoting moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers.  Dr. Magleby proceeded to explain that given her impairments, Plaintiff's work-related mental abilities were impaired to the extent noted:

1.  To understand, remember and follow instructions was not impaired;
2.  To maintain attention, concentration, persistence and pace to perform simple, repetitive tasks and to perform multi-step tasks was mildly impaired;
3.  To relate to others including fellow workers and supervisors was moderately impaired;
4.  To withstand stress and pressures associated with day-to-day work activity was moderately impaired; and
5.  To manage money and benefits was not impaired (Docket No. 10, pp. 300-305 of 470).

7.  **MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT (MRFC) AND PSYCHIATRIC REVIEW TECHNIQUE EVALUATION (PRT).**

On May 6, 2010, Dr. Caroline Lewis, Ph. D., completed the MRFC and the PRT.  On the MRFC, she considered and evaluated Plaintiff's impairments, opining that Plaintiff had moderate limitations in her abilities to:

1.  Understand and remember detailed instructions;
2.  Carry out detailed instructions;
3.  Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
4.  Interact appropriately with the general public;
5.  Get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and

15

      6.   Respond appropriately to changes in the work setting (Docket No. 10, pp. 308-311 of 470).

For the period of November 1, 2009 to May 6, 2010, Dr. Lewis determined that there was documented evidence of a depressive disorder, NOS, and an anxiety related disorder that was evidenced by recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.  In her opinion, the degree of functional limitations that resulted from Plaintiff's mental disorders was:

| | |
|---|---|
| 1. Restriction of Activities in Daily Living | Mild |
| 2. Difficulties in maintaining social functioning | Moderate |
| 3. Difficulties in maintaining concentration, persistence or pace | Moderate |
| 4. Episodes of decompensation, each of extended duration | None |

There was no evidence of "C" criteria.  In other words, there was no evidence reflecting the existence of extremely severe mental condition of at least two years' duration that caused more than a minimal limitation of ability to do any basic work activity (Docket No. 10, pp. 312-323 of 470).

## V.  The Legal framework for evaluating DIB claims

The Commissioner's regulations governing the evaluation of disability for DIB are found at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6ᵗʰ Cir. 2007).  DIB is available only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id*. (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270,

274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at 730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)].  Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities." *Id.*  Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*  Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*  For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1.  At step one, Plaintiff met the insured status requirements of the Act through June 30, 2014.  She had not engaged in substantial gainful activity since November 1, 2009.

17

2. At step two, Plaintiff had severe impairments, namely, MS, vertigo and an affective disorder.

3. At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity to perform light work, including the abilities to:

   a. Lift and/or carry up to 20 pounds occasionally;
   b. Lift and/or carry up to 10 pounds frequently;
   c. Sit with normal breaks for a total of six hours in an eight-hour workday; and
   d. Stand and/or walk with normal breaks for a total of six hours in an eight-hour workday.

   Plaintiff was limited as follows:

   a. Could occasionally climb ramps and stairs;
   b. Could never climb using ladders, ropes and scaffolds;
   c. Must avoid all exposure to hazardous machinery and heights;
   d. Due to mental limitations, could handle simple but not complex instructions;
   e. Could supervise others, but would be most comfortable working alone; and
   f. Was limited to work in a low stress environment, i.e., involving brief and superficial contact with others, in a routine setting, without demands for meeting strict time and performance standards.

4. At step four, Plaintiff was unable to perform any past relevant work.

5. At step five, considering that Plaintiff was a younger individual with at least a high school education, she was able to communicate in English and her residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

6. In conclusion, Plaintiff has not been under a disability, as defined in the Act from November 1, 2009 through the date of the decision.

(Docket No. 10, pp. 25-36 of 470).

## VII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an

ALJ in a Social Security action is not *de novo*.  *Norman v. Astrue,* 694 F. Supp.2d 738, 740 (N. D.

18

Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011).  Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings.  *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)).  "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence.  *Id.* at 740-741.  To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)).  Further, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on record.  *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)).  In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact.  *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers.  *Id.*  It presupposes that there is a zone of choice within which the decision maker can go either way without interference by the courts."  *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003)).  However, even if an ALJ's

19

decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VIII. ANALYSIS.

Plaintiff seeks reversal and remand for the reason that the ALJ's erred in finding that she retained the residual functional capacity for light work.  Specifically, the ALJ failed to consider the limiting effects of vertigo, her need to sit for a majority of the day, a sit/stand option or the need to sit or lay down after a vertigo episode.  Additionally, Plaintiff argues that the ALJ made only a passing reference to Plaintiff's mental issues.  Consequently, the residual functional capacity for light work cannot possibly be supported by substantial evidence.

### 1. THE LAW.

A person who has no impairment(s) would be able to do all basic work activities at normal levels; he or she would have an unlimited functional capacity to do basic work activities.  20 C. F. R. §§ 404.1594; 416.994 (Thomson Reuters 2013).  What a person can still do despite an impairment, is called his or her residual functional capacity.  20 C. F. R. §§ 404.1594; 416.994 (Thomson Reuters 2013).

The responsibility for determining a claimant's residual functional capacity resides with the ALJ. *Fleischer v. Astrue*, 774 F.Supp.2d 875, 881 (N.D.Ohio,2011) (*see* 20 C.F.R. §§ 404.1546(c)). In rendering a residual functional capacity decision, the ALJ must (1) give some indication of the evidence upon which he or she is relying, and (2) not ignore evidence that does not support the decision, especially when that evidence, if accepted, would change the analysis. *Id.* (*See Bryan v.*

20

*Commissioner of Social Security*, 383 Fed.Appx. 140, 148 (3rd Cir.2010) (*quoting Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3rd Cir.2000) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [ . . . ] contradictory, objective medical evidence' presented to him.")); *Baltazar v. Astrue*, 2011 U.S. Dist. LEXIS 4641, *22 (W.D.Ark. Jan. 18, 2011) (*citing Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir.2009); 20 C.F.R. §§ 404.1527(f)(2), 416.927(f)(2); SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).

 2.  APPLICATION OF THE LAW TO ALJ'S DECISION.

The ALJ considered the entirety of Plaintiff's medical evidence in calculating her residual functional capacity, applied the correct legal standards in reaching his conclusion and substantial evidence supports that conclusion.  Without presenting probative evidence in support, Plaintiff was not entirely persuasive that she needed to sit for a majority of the day, that she needed a sit/stand option or that she needed to sit or lie down after a vertigo episode.  Arguably, the ALJ was not required to consider these unsubstantiated limitations in assessing residual functional capacity.

The ALJ did acknowledge that the neurological symptoms of Plaintiff's MS could have reasonably included vertigo and dizziness because such evidence was generally consistent with the objective medical evidence.  He was not persuaded by the medical evidence that the functionality or limiting effects of these symptoms were corroborated by the objective medical evidence (Docket No. 10, p. 29 of 470).

The ALJ focused particularly on the only physical residual functional capacity assessment

21

in the record performed by Dr. McCloud.  In his assessment, Dr. McCloud determined that Plaintiff was capable of occasionally lifting and/or carry twenty pounds; frequently lifting and/or carrying ten pounds; standing and/or walking for a total of about six hours in an eight-hour workday; and sitting about six hours in an eight-hour workday.  The ALJ adopted these exertional limitations in their entirety.

Furthermore, the ALJ did not ignore evidence from Dr. Sheppard who early in the treatment relationship recorded a myriad of negative neurological signs and severe symptoms, including vertigo and dizziness.  Neither did he simply mimic Dr. Sheppard's opinions.  On January 7, 2011, Dr. Sheppard's noted that Plaintiff was stable neurologically and that "nothing that looks like MS is out of control" (Docket No. 10, pp. 392-393 of 470).  The ALJ drew a reasonable conclusion that when she took the medicine, Plaintiff's symptoms, including vertigo and dizziness, were relieved.


Neither did the ALJ disregard the testimony of Plaintiff in fashioning the appropriate residual functional capacity.  The ALJ considered but devalued Plaintiff's testimony and her written statement supplied on April 15, 2011, articulating that Dr. Sheppard did not find that Plaintiff lacked physical tolerance for any sustained activity or unable to return to the workforce in any gainful capacity.

The ALJ's opinions contain an analysis of how the residual functional capacity finding came to involve a restriction to light work.  Substantial evidence supports the ALJ's residual functional capacity finding to the extent that it includes what Plaintiff can do even with symptoms of dizziness and vertigo.

Contrary to Plaintiff's assertions, the ALJ properly considered the mental impairments in

determining Plaintiff's residual functional capacity to do past work and other work.  The ALJ referenced findings from Portage Path mental health professionals, other mental status evaluations, Plaintiff's global assessment of functioning scores, as well as Plaintiff's treatment records and hearing testimony.  Although the consultative examiner indicated that Plaintiff had moderate impairments in her ability to relate to others, and to withstand the stresses and pressures associated with day-to-day work activity, the ALJ concluded that Plaintiff had no more than mild restrictions in the activities of daily living and social functioning given her work history and treatment for depression.  The ALJ incorporated these limitations into his determination of Petitioner's residual functional capacity, finding that given her mental limitations, Plaintiff could manage simple but not complex instructions; could supervise others, but would be most comfortable working alone; and could perform work limited to a low stress environment.

The Magistrate concludes that the ALJ considered the relevant evidence regarding Plaintiff's mental impairment in assessing residual functional capacity and that substantial evidence supports his conclusions.  Accordingly the Magistrate must uphold the ALJ's conclusion that Plaintiff can perform light work subject to the designated restrictions.

### IX.  CONCLUSION

The Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.


/s/Vernelis K. Armstrong
United States Magistrate Judge.


Date:   August 12, 2013

23

### XII.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.

24